UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

METAL ONE AMERICA, INC.,
a Delaware corporation

        Plaintiff,

v.                                  Case No. 1:04-cv-431

CENTER MANUFACTURING, INC.,      HON. GORDON J. QUIST
a Michigan corporation

        Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Metal One America, Inc. ("Metal One"), has sued Defendant, Center Manufacturing, Inc. ("Center"), alleging that Center breached a contract between Metal One and Center by acting in bad faith pursuant to M.C.L.A. § 440.2306(1). Metal One moved for summary judgment as to liability only on April 29, 2005. The court concluded that Center breached the contract in bad faith and granted the summary judgment on July 14, 2005. On August 2, 2005, the court conducted a bench trial to determine the amount of damages. During the trial, the court received testimony from Pritchett, Nielsen, Neikirk, Steffee and Davison. This case is now ready for decision.

### Findings of Fact

**A.**    **The Business Relationship**

Metal One is a steel trading company that buys and sells steel without taking physical possession of the steel. Center is a producer of complex metal assemblies. One of Center's operations is to buy cold drawn steel bars ("steel bars") and process them into television screen

frames. Based upon representations of volume made to it by Sony Corporation ("Sony"), Center established a plant in Corona, California solely to supply 21-inch and 29-inch television frames to Sony. Center started to purchase steel bars from Metal One for the operation of the Corona plant sometime around January 2002. All of the steel bars from Metal One are specifically for the production of 29-inch frames.

Plymouth Steel Corporation ("Plymouth") was Metal One's supplier of steel bars. Plymouth manufactured steel bars using hot roll bar material according to the specifications required by Metal One. Plymouth delivered steel bars directly to Center.

Corus is a company in England. It supplied Plymouth the hot roll material that Plymouth used to make the steel bars.

The manufacture and delivery of the steel bars take three to four months. Moreover, both the steel bars produced by Plymouth and the hot roll bars produced by Corus are highly engineered products. Once they are processed, they are only suitable for producing Sony's 29-inch frames. Center was aware of the commercial relationship among Metal One, Plymouth, and Corus. Center was also aware of the high specialization of the steel bars and hot roll bars and the lead time needed to produce and deliver them to Center.

**B.     The Inventory Management**

Both Sony and Center maintained a "just-in-time" inventory system to minimize overhead. In other words, both Sony and Center kept a minimum of inventory and expected their suppliers to make on time delivery. Sony's volume of production was highly fluctuating. Sony could increase or decrease its orders anytime, and Center had to be flexible in order to respond to Sony's orders. Because Center also kept a "just-in-time" inventory system, Center required Plymouth to make on time delivery of steel bars so that Center could produce frames to meet Sony's demands.

Because of the fluctuation of Sony's orders, Center was unable to give Metal One an accurate estimate of steel bars that Center would order in the future. Based upon Sony's forecast, Center provided Metal One blanket purchase orders ("blanket orders") which gave Metal One a general idea of the volume of steel bars needed in the next few months. Metal One then notified Plymouth of this forecast so that Plymouth could project the amount of hot roll bars to order from Corus. Center's estimate in its blanket orders fluctuated frequently, depending upon Sony's volume of production. Therefore, Metal One and Plymouth would not ship anything on the blanket orders. Rather, Metal One would ship only when it received a firm release from Center. However, Center often sent Metal One a firm release only a few days or weeks in advance of the required delivery date. Therefore, if Metal One and Plymouth waited for the firm release and then ordered hot roll bars from England, Plymouth would not be able to meet Center's on time delivery requirement. As a result, Plymouth held, on behalf of Metal One, at least three or four months worth of steel bar and hot roll bar inventory.

**C.     The Cancellation**

On July 30, 2003, Center released a shipment of 315,000 pounds of steel bars for delivery to it in August, September, and October. Metal One forwarded this information to Plymouth on the same day.

On August 4 or 5, 2003, Don Steffee ("Steffee"), Center's director of purchasing, called Ronald Davison, the sales manager of Metal One, and notified him that Center may close down its plant in Corona. Prior to this call, Metal One had no notice of the impending shutdown. Metal One immediately instructed Plymouth to cancel any order it could from Corus. On August 12, 2003, prior to the delivery of the released steel bars, Metal One received an official notice from Center that it

would close down the Corona plant.  After August 12, Center did not order any more steel bars from Metal One.

**D.     The Shutdown**

During the trial, Metal One presented Center's internal documents to demonstrate that, as early as two years before Center's notice of cancellation, Center had contemplated closing down the Corona plant if it did not obtain enough orders from Sony.  For instance, the minutes of Center's board meeting held on January 22, 2002 stated: "When we get January's results, if we're showing a big loss or we haven't made the progress expected, we're going to make a decision if we will continue the operation . . . ."  (Board Meeting Minutes of 1/22/02, Pl.'s Trial Ex. 9.)  "Sony continues to put price pressures on us; however, a specter of a plant closure has been raised to them . . . ."  (Board Meeting Minutes of 10/22/02, Pl.'s Ex. 14.)  "[Sony's feedback] was not good enough and we need to begin winding down operations at Center's California facility . . . We now have to look at what the impact of the California operation has been on Center Manufacturing and what the closure of the facility would mean."  (E-mail from Nielsen to Challgren of 12/05/02, Pl.'s Trial Ex. 16.)  On the other hand, in spite of all these discussions regarding the potential shutdown of the plant, Center did not reveal to Metal One the problems with Sony and the impending shutdown until August 2003.

As of August 6, 2003, Plymouth held in inventory on Metal One's behalf 233,280 pounds of steel bars and 663,287 pounds of hot roll bars.  Metal One and Plymouth sold the steel bars to Sumitomo USA, Inc. at a loss of $57,702.  They sold the hot roll bars back to Corus at a loss of $90,870.  Metal One was contractually obligated to pay Plymouth for the loss.  Therefore, Metal One's damages, exclusive of attorney fees and prejudgment interest, are $148,572.

4

Metal One moved for summary judgment as to liability only on April 29, 2005, and the court granted the summary judgment on July 14, 2005. The court conducted a bench trial on August 2, 2005 to determine the amount of damages incurred by Metal One. Metal One contends that, in addition to the $148,572 contractual damages, Center is liable for attorney fees and prejudgment interest. Metal One argues that the attorney fees are incidental damages as a result of Center's breach, and thus recoverable pursuant to M.C.L.A. §§ 440.2708(1) and 440.2710. On the other hand, Center argues that the inventory level is excessive because Plymouth was holding nine months worth of inventory at the time of termination, while the lead time to replace the inventory takes only three to four months. Moreover, Center contends that it is not liable for any attorney fees absent any court rulings, statutes or case law.

## Conclusions of Law

The issues presented to the court are: 1) whether Center is responsible for the inventory held by Plymouth at the time of termination, and 2) whether Metal One is entitled to an award of attorney fees.

**A.    The Inventory**

M.C.L.A. § 440.2706 allows a seller to recover the difference between the contract price and the resale price.

> Sec. 2706.  (1) Under the conditions stated in section 2703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 2710), but less expenses saved in consequence of the buyer's breach.

M.C.L.A. § 440.2706.

M.C.L.A. § 440.2710 defines "incidental damages" as:

5

> Sec. 2710. Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

M.C.L.A. § 440.2710.

The court concludes that Center is liable for the loss Metal One incurred in the resale of the steel bars and hot roll bars. M.C.L.A. § 440.2706 requires a seller to resell the goods in a commercially reasonable manner to mitigate damages. In the instant case, the parties do not dispute Metal One's good faith effort to resell the goods to Sumitomo and Corus. As a result, Metal One may recover the difference between the resale price and the contract price. With respect to the hot roll bars, the contract price with Center was $266,641 while the resale price to Corus was $175,771 (Purchase cost from Plymouth $255,365 less Plymouth's loss in resale to Corus $79,594). Therefore, the difference between the contract price and the resale price is $90,870.

With respect to the steel bars, the contract price with Center is $93,779 while the resale price to Sumitomo is $36,077. Therefore, the difference between the contract price and the resale price is $57,702. In sum, Center is liable to contractual damages in the amount of $148,572 (the sum of $90,870 and $57,702).

Center argues that the level of inventory held by Plymouth is excessive because it held nine months worth of inventory (about 900,000 pounds of steel). Center argues that, because the average monthly shipment of steel to the Corona plant is 110,000 pounds and the lead time to replace the inventory is three to four months, Center is responsible for only three and a half months worth of inventory (330,000 pounds of steel).

During the trial, to rebut Center's argument of excessive inventory, Metal One provided the calculation of monthly shipment of steel and the testimony of Bob Pritchett, a salesperson for

Plymouth. Pritchett testified that the average monthly shipment of steel to the Corona plant was 128,587 pounds, and the level of inventory held by Plymouth at the time of termination was reasonable. Pritchett also testified that Metal One did not decide the level of inventory held by Plymouth. In other words, Metal One did not decide the quantity of the hot roll bars to order from Corus and the quantity of the steel bars Plymouth held as inventory. Instead, Pritchett used his professional judgment as a salesperson to decide how much to order from Corus based on the level of inventory Plymouth maintained at a specific time. In addition, Pritchett testified that he may place a relatively large order to Corus because Corus required each order to be in the increment of 200,000 pounds. Furthermore, Terry Neikirk, the vice president and controller of Metal One, testified that Metal One did not require Plymouth to maintain a minimum level of inventory; rather, Metal One relied on Plymouth's professional judgment regarding the level of inventory.

This court concludes that the inventory Plymouth held at the time of termination was reasonable. At the time of termination, Plymouth held a total of 896,567 pounds of steel (233,280 pounds of steel bars and 663,287 pounds of hot roll bars). In light of an average shipment of 128,587 pounds to the Corona plant, it will take almost 7 months to clean up Plymouth's inventory. On the other hand, the lead time to replace the inventory takes three to four months. Therefore, taking into consideration various factors (e.g. the fluctuation of Center's demand, the additional time to cross the Atlantic in bad weather, delays that occur at customs, Corus' requirement to order in the increment of 200,000 pounds), the level of inventory held by Plymouth at the time of termination was reasonable. As a result, Center is responsible for the loss that Metal One incurred in the resale of all of this inventory.

Metal One also contends that it is entitled to prejudgment interest on the amount of the damages pursuant to M.C.L.A. § 600.6013. Metal One states that, as of July 1, 2005, the

7

prejudgment interest rate is 3.845%. Center has not addressed the issue of prejudgment interest in its trial brief.

M.C.L.A. § 600.6013 provides:

(8) Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs . . . .

M.C.L.A. 600.6013.

The court concludes that pursuant to M.C.L.A. § 600.6013(8), Metal One is entitled to prejudgment interest for the amount of damages of $148,572. The prejudgment interest will run from June 28, 2004, the date when the complaint was filed. However, the court is not able to determine the interest rate because Metal One has not provided any certification from the state treasurer to substantiate the rate that it quotes. This, however, is usually determined by the parties with software provided to lawyers.

**B.      The Attorney Fees**

Under Michigan law, attorney fees are generally not recoverable. "For better or worse, the common-law tradition in Michigan follows what is sometimes called the 'American rule' regarding attorney fees. Under this rule, attorney fees are not ordinarily recoverable unless a statute, court rule, or common-law exception provides to the contrary." *Popma v. Auto Club Ins. Ass'n*, 446 Mich. 460, 474, 521 N.W.2d 831, 837-838 (1994) (citations omitted). "Generally, attorney fees are not recoverable unless expressly allowed by statute, court rule, or common-law exception. Exceptions are narrowly construed." *Elm Plating Co. v. J Mark Sys., Inc.*, No. 238446, 239590, 2003 WL

8

21419276, at *2 (Mich. App. June 19, 2003) (citations omitted). Indeed, "[t]he general rule in Michigan prohibits the awarding of attorney's fees as an element of costs or damages." *H & L Heating Co. v. Bryn Mawr Apartments of Ypsilanti, Ltd.*, 97 Mich. App. 496, 506-507, 296 N.W.2d 354, 358 (1980) (citations omitted).

On the other hand, in a breach of warranty case, the court can award attorney fees as incidental damages under M.C.L.A. § 440.2714. In *Cady v. Dick Loehr's, Inc.*, 100 Mich. App. 543, 548-549, 299 N.W.2d 69, 71-72 (1980), the court held that a trial court has discretion to award attorney fees "as an element of the damages incurred as a result of a breach of warranty." Similarly, in *Kelynack v. Yamaha Motor Corporation, USA*, 152 Mich. App. 105, 115-116, 394 N.W.2d 17, 21-22 (1986), the court held that the manufacturer breached the warranty and the trial court had discretion to award attorney fees as incidental or consequential damages.

In the instant case, the parties do not have an agreement that provides for the award of attorney fees incurred by Metal One as a result of Center's breach of contract. In addition, Metal One has not provided any statutes, cases or court rules that award attorney fees in such a situation. Metal One cites *Cady* and *Kelynack* and argues that the court should follow these two cases and award attorney fees. However, *Cady* and *Kelynack* are both breach of warranty cases, and the court expressly ruled that it has discretion to award attorney fees in a breach of warranty case. Subsequent cases that cited *Cady* and *Kelynack* also limited the application of these two cases to a breach of warranty situation. Therefore, this court will follow the "American rule" and will not expand the rulings of *Cady* and *Kelynack* to a breach of contract case between merchants. As a result, Metal One may not recover the attorney fees incurred as a result of Center's breach.

## **Conclusion**

For the foregoing reasons, the court finds that Center is liable for the contractual damages that Metal One incurred in the resale of the inventory held by Plymouth at the time of termination. The court will award damages in the amount of $148,572 to Metal One, plus prejudgment interest running from June 28, 2004, plus costs. Center is not liable for attorney fees incurred by Metal One.


Dated:  August 10, 2005                                             /s/ Gordon J. Quist
                                                                  GORDON J. QUIST
                                                            UNITED STATES DISTRICT JUDGE